2008 UT 28

**ELLSWORTH PAULSEN CONSTRUC-
TION COMPANY, Plaintiff, Peti-
tioner, and Cross–Respondent,**

v.

**51–SPR–L.L.C., Defendant, Respondent,
and Cross–Petitioner.**

Nos. 20060864, 20060882.

Supreme Court of Utah.

April 8, 2008.

Mark L. Poulsen, Bret W. Reich, Sandy, for plaintiff.

R. Stephen Marshall, Erik A. Olson, Salt Lake City, for defendant.

PARRISH, Justice:

### INTRODUCTION

¶ 1 51–SPR–L.L.C. ("51–SPR") entered into a development agreement with Guy Hatch ("Hatch") and his company, Broadstone Investments, L.L.C. ("Broadstone"), to develop two commercial office buildings in American Fork, Utah (the "Northshore Project"). Hatch, without disclosing the in-

volvement of 51–SPR, entered into two construction contracts with Ellsworth Paulsen Construction Company ("EPCO") for the construction of the two Northshore buildings. Toward the end of the project, the relationship between Hatch and 51–SPR soured, resulting in Broadstone relinquishing its one-half interest in the Northshore property to 51–SPR. After learning of 51–SPR's involvement in the project, EPCO approached 51–SPR regarding unpaid construction invoices. 51–SPR, viewing itself as a mere investor, disclaimed any obligation to pay EPCO for the construction costs. EPCO then filed a mechanic's lien against the two Northshore buildings. The lien included a $78,000 claim stemming from a prior business deal between Hatch and EPCO. Additionally, EPCO brought a contractual claim against 51–SPR, claiming that 51–SPR was a partner or joint venturer with Broadstone and, therefore, was jointly liable on the construction contracts.

¶ 2 The district court granted partial summary judgment to EPCO, holding that 51–SPR and Broadstone were joint venturers. Additionally, following a trial, the district court held that EPCO could not collect the $78,000 claim as part of its lien on the Northshore property, but that the inclusion of the claim did not constitute an abusive lien under section 38–1–25 of the Utah Code. The court of appeals reversed the district court's partial summary judgment regarding the existence of a joint venture but upheld the district court's judgment regarding the lien. *Ellsworth Paulsen Constr. Co. v. 51–SPR–L.L.C.*, 2006 UT App 353, 144 P.3d 261. We affirm the decision of the court of appeals.

## BACKGROUND

### I. FACTUAL BACKGROUND

¶ 3 In 2000, Robert Chimento, acting on behalf of 51–SPR, entered into a development agreement (the "Agreement") with Hatch, acting on behalf of Broadstone. The Agreement contemplated the development of two commercial office buildings ("Building I" and "Building II") in American Fork, Utah. The Agreement provided, among other things, that 51–SPR would contribute $2.9 million toward the purchase and development of the Northshore property, that Broadstone would act as the project manager, and that 51–SPR and Broadstone would take title to the property as tenants in common. Broadstone then entered into two construction contracts with EPCO for construction of the two buildings. From the time the construction contracts were entered through near completion of the project, EPCO had no knowledge of 51–SPR's involvement in the project because all of EPCO's dealings had been exclusively with Hatch.

¶ 4 Prior to the Northshore Project, EPCO and Hatch had collaborated on other construction projects. In the first project (the "Broadstone Project"), EPCO constructed six office buildings as part of a Hatch development project. Toward the end of the Broadstone Project, Hatch began plans for the development of more office buildings on land owned by Lloyd Williams (the "Williams Project"). At that time, EPCO loaned $110,000 to Vintage Construction ("Vintage"), the Hatch-related company that was involved in developing the Broadstone Project and the Williams Project. A portion of the loan, $32,000, was earmarked for the Broadstone Project, and the remaining $78,000 was earmarked for the Williams Project. Although Hatch never informed EPCO exactly how the money would be used, EPCO assumed—based on Hatch's representations—that the $78,000 would either be used for engineering design work and other costs for the Williams Project or be applied to the construction of the proposed buildings on the Williams property. Hatch agreed that in return for the $78,000 loan, he would give EPCO a change order on the first building constructed on the Williams property. However, the Williams Project was never developed; instead, the office buildings that Hatch had proposed to build on the Williams property were built on the Northshore property as part of the Northshore Project. By the time Hatch and EPCO were working on the Northshore Project, Vintage had not repaid the $78,000 to EPCO. In order to pay the $78,000 loan to EPCO, Hatch provided EPCO with a change order in the amount of $78,000 on Building II of the Northshore Project so that EPCO could be repaid through the Northshore Project's construction loans.

¶ 5 Toward the end of the Northshore Project, 51–SPR accused Hatch of materially breaching the Agreement by mismanaging the construction funds. 51–SPR confronted Hatch, and Hatch agreed to relinquish Broadstone's one-half interest in the Northshore Project to 51–SPR. Hatch then apparently fled to Hawaii, leaving EPCO with nowhere to send its final invoices. It was at this point that EPCO discovered 51–SPR's involvement in the project and approached 51–SPR directly for payment for the completed work. 51–SPR, viewing itself as a mere investor, disclaimed any obligation to pay EPCO for the construction costs.

## II. PROCEDURAL BACKGROUND

¶ 6 EPCO filed mechanic's liens against the two Northshore buildings and commenced an action to foreclose the liens. EPCO included in the lien amount the $78,000 change order on Building II that Hatch had provided to repay the loan from EPCO. EPCO also asserted breach of contract claims against 51–SPR on the theory that 51–SPR was in a partnership or joint venture relationship with Broadstone and therefore jointly liable on the construction contracts. In a separate proceeding, 51–SPR brought an action to quiet title to the two Northshore buildings. 51–SPR also brought a claim against EPCO under Utah's abusive lien statute, section 38–1–25 of the Utah Code, for including the $78,000 claim as part of its lien on the Northshore property. These proceedings were later consolidated.

¶ 7 EPCO moved for partial summary judgment on the issue of 51–SPR's liability as a partner or joint venturer of Broadstone. 51–SPR opposed the motion, arguing that summary judgment was not appropriate because there was a material issue of fact regarding one of the elements of a partnership or joint venture: whether 51–SPR and Broadstone agreed to share losses. Relying on statements contained in an affidavit of Robert Chimento, 51–SPR argued that Broadstone had agreed to bear all of the risk of loss. In his affidavit, Chimento stated that "[u]nder the Agreement, Broadstone and Hatch were solely responsible for all expenses, costs, losses, and risks associated with the Northshore project" and that "51–SPR was not liable or responsible for any

losses, liabilities, or responsibilities relating to the [Northshore] Property, and under its arrangement with Broadstone, stood to lose only its investment in the Property and nothing more." The district court, however, held that Chimento's "bald assertions" did not create a genuine issue of material fact and granted EPCO partial summary judgment.

¶ 8 Later in the proceedings, after holding a three-day bench trial, the district court ruled that EPCO could not collect the $78,000 claim as part of its lien because the $78,000 did not relate to the development of the Northshore property. Nevertheless, the court held that the inclusion of the $78,000 claim did not render the lien abusive under section 38–1–25 of the Utah Code because EPCO did not know, at the time it filed the lien, how much—if any—of the $78,000 had been applied to the construction of the Northshore buildings. Because EPCO acted in good faith when it included the $78,000 claim as part of its lien on the Northshore buildings, the lien was not abusive.

¶ 9 Both parties appealed the district court's rulings. The court of appeals held that the district court erred by inferring on summary judgment that the parties intended to share losses. *Ellsworth Paulsen Constr. Co. v. 51–SPR–L.L.C.*, 2006 UT App 353, ¶ 18, 144 P.3d 261. The court concluded that Chimento's affidavit created an issue of fact concerning the duty to share losses. *Id.* ¶¶ 14–18. Thus, it held that summary judgment was inappropriate. *Id.* ¶ 18.

¶ 10 In addition, the court of appeals upheld the district court's ruling that EPCO could not collect the $78,000 amount included in the lien because it did not relate to the Northshore Project. *Id.* ¶¶ 26–29. It also upheld the district court's ruling that EPCO's inclusion of the $78,000 amount did not render the lien abusive under Utah law. *Id.* ¶ 34.

¶ 11 Both parties petitioned this court for a writ of certiorari. We granted both petitions and have jurisdiction pursuant to Utah Code section 78A–3–102(3)(a) (2008).

## ISSUES AND STANDARD OF REVIEW

¶ 12 We granted certiorari on two issues. The first issue is whether summary judgment was appropriate on EPCO's claim

that 51–SPR and Broadstone were involved in a joint venture, thereby rendering 51–SPR subject to liability arising from the venture. " '[S]ummary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' " *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 16, 134 P.3d 1122 (quoting *Norman v. Arnold*, 2002 UT 81, ¶ 15, 57 P.3d 997). "On certiorari review, this court reviews the decision of the court of appeals, not the decision of the district court." *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 2007 UT 25, ¶ 11, 156 P.3d 806. The court of appeals reviewed the district court's grant of a motion for summary judgment. "Because a summary judgment presents questions of law, we accord no particular deference to the court of appeals' ruling and review it for correctness." *Machock v. Fink*, 2006 UT 30, ¶ 8, 137 P.3d 779 (citation and internal quotation marks omitted). Furthermore, we "view the facts and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *Dowling v. Bullen*, 2004 UT 50, ¶ 7, 94 P.3d 915.

■ ¶ 13 The second issue is whether the court of appeals correctly construed Utah's abusive lien statute, Utah Code section 38–1–25 (2005). "We review the court of appeals' interpretation of the relevant statute for correctness, according no deference to its conclusions." *Regal Ins. Co. v. Canal Ins. Co.*, 2004 UT 19, ¶ 5, 93 P.3d 99.

## ANALYSIS

I. THE COURT OF APPEALS CORRECTLY HELD THAT THE DISTRICT COURT ERRED IN DETERMINING THE EXISTENCE OF A JOINT VENTURE ON SUMMARY JUDGMENT BECAUSE THERE EXISTED A MATERIAL ISSUE OF FACT REGARDING THE SHARING OF LOSSES

¶ 14 EPCO petitions for review of the court of appeals' holding that the district court erroneously granted partial summary judgment on EPCO's joint venture claim. The court of appeals concluded that an issue of fact existed as to whether 51–SPR and Broadstone agreed to share losses and that, because an issue of fact existed, partial summary judgment was inappropriate. *Ellsworth Paulsen Constr. Co. v. 51–SPR–L.L.C.*, 2006 UT App 353, ¶ 10, 144 P.3d 261. We agree with the court of appeals that "there is a genuine issue of material fact regarding the key issue of whether [51–SPR] agreed to share losses with Broadstone," *id.*, and therefore affirm the court of appeals' reversal of the district court's partial summary judgment.

### A. Elements of a Joint Venture

■ ¶ 15 More than thirty years ago, we laid out the essential elements of a joint venture in *Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974).

> The parties must combine their property, money, effects, skill, labor and knowledge. As a general rule, there must be [1] a community of interest in the performance of the common purpose, [2] a joint proprietary interest in the subject matter, [3] a mutual right to control, [4] a right to share in the profits, and [5] unless there is an agreement to the contrary, a duty to share in any losses which may be sustained.[1]

*Id.* "Whether a joint venture exists is ordinarily a question of fact." *Strand v. Cranney*, 607 P.2d 295, 296 (Utah 1980); *see also Rogers v. M.O. Bitner Co.*, 738 P.2d 1029, 1032 (Utah 1987). A court must therefore look at the facts of the case and determine whether there is evidence to support each of

---

1. Although the *Bassett* court originally established these elements for the purpose of determining the existence of a joint venture, they have since been used to determine the existence of partnerships as well. *See Mardanlou v. Ghaffari-* an, 2006 UT App 165, ¶ 15 & n. 2, 135 P.3d 904 (applying the *Bassett* elements to a partnership). Thus, although EPCO alleged that Broadstone and 51–SPR were either partners or joint venturers, the distinction is irrelevant to our analysis.

the five elements of a joint venture.[2]

¶ 16 The only element at issue in this appeal is the fifth element: a duty to share in the losses. The duty to share losses is an important element of a joint venture. Indeed, loss sharing is a critical distinction between an investment-type relationship—in which the first four elements may be present, but investors have no duty to share in the losses beyond the amount of their investment—and a joint venture relationship. For this reason, "a contract not to share losses weighs heavily against partnership because it is so inconsistent with the standard partnership form." *Bromberg and Ribstein on Partnership*, § 2.07(d)(2) (Supp.2006); *see also McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 479 (Tex.Ct.App. 1993) ("Generally, the absence of a provision to share losses indicates the lack of intent to create a partnership.").

### B. Meeting the Sharing of Losses Element at Trial

¶ 17 Whether there is a duty to share losses is—like the other four elements—a question of fact. *See Latiolais v. BFI of La., Inc.*, 567 So.2d 1159, 1162 (La.Ct. App.1990) ("The issue as to whether the parties ... anticipated a sharing of losses is clearly an issue of fact within the province of the jury."). Thus, at trial, the party asserting the existence of a joint venture must present some evidence of loss sharing. The most obvious way to meet this evidentiary burden is to show that the agreement between the parties contains a clear and unambiguous loss-sharing provision. *See Ellsworth Paulsen Constr. Co.*, 2006 UT App 353, ¶ 11, 144 P.3d 261 ("It goes without saying that a duty to share losses is present in a relationship where a 'written agreement specifically provide[s] for the sharing of losses.' " (quoting *Harline v. Campbell*, 728 P.2d 980, 983 (Utah 1986))).

¶ 18 It is often the case, however, that the agreement between the parties does not include a clear statement on the issue of loss sharing. *See Cutler v. Bowen*, 543 P.2d 1349, 1351 (Utah 1975) ("When parties join in an enterprise, it is usually in contemplation of success and making profits, and is often without much concern about who will bear losses."); *Bromberg and Ribstein on Partnership*, § 2.07(d)(2) (noting that the question of whether a partnership exists in the absence of an express agreement to share losses "is significant because purported partners, expecting profits, often do not provide for losses one way or the other"). In this situation, the party asserting the existence of a joint venture must present other evidence to satisfy the loss-sharing element. For example, the asserting party may show that the actions of the parties demonstrate an intent to share losses. *See Rogers*, 738 P.2d at 1032 ("A joint venture does not always arise pursuant to formal agreement; rather, it is a relationship voluntarily entered by the parties and may be proven by the actions taken by the parties."). Alternatively, the asserting party may show that the agreement, although lacking a clear statement regarding loss sharing, shows an intent to share losses. *See Bassett*, 530 P.2d at 2 ("While the agreement to share losses need not necessarily be stated in specific terms, the agreement must be such as to permit the court to infer that the parties intend to share losses as well as profits."); *see also Latiolais*, 567 So.2d at 1162 ("[A]n agreement to share losses may be implied if consistent with the overall terms of the agreement."). The asserting party may also rely on a profit-sharing provision in the agreement as prima facie evidence that the parties agreed to share losses. *See Bentley v. Brossard*, 33 Utah 396, 94 P. 736, 741 (1908) ("[I]t has been quite generally held that an agreement to share profits, nothing being said about losses, amounts *prima facie* to an agreement to share losses also.").[3] Once the asserting party has pre-

2. EPCO cites language from the court of appeals' opinion in *Mardanlou*, 2006 UT App 165, ¶ 15, 135 P.3d 904, as support for the proposition that proof of each element is not necessary in each case. For the reasons discussed throughout this opinion, we conclude that some proof of each element of a joint venture must be presented when the existence of a joint venture is at issue. To the extent that *Mardanlou* suggests otherwise, we overrule it.

3. EPCO also argues that a court may infer a duty to share losses when one party provides labor and the other party provides capital. We do not

sented some evidence of loss sharing, the finder of fact can then weigh that evidence against the evidence presented by the opposing party to determine if the parties intended to share losses.

## C. Meeting the Sharing of Losses Element on Summary Judgment

▓ ¶ 19 Although a court may, as part of its fact-finding function at trial, infer an intent to share losses from the agreement, from the parties' actions, or from a profit-sharing provision, the issue before us is whether it is appropriate for a court to make such an inference on summary judgment. This question is especially important in a case such as this one, in which the other four elements of a joint venture are undisputed. We agree with the court of appeals that such an inference can be made—thereby making summary judgment appropriate—only if the opposing party does not present evidence to refute the inference. *See Bassett*, 530 P.2d at 2. ("[When the] facts are not in dispute ... the question of the relationship of the parties is a matter of law.").

¶ 20 Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). Here, there were no factual disputes regarding the first four elements of a joint venture. Both parties conceded that the plain language of the Agreement between 51–SPR and Broadstone clearly demonstrated that there was "a community of interest in the performance of the common purpose, a joint proprietary interest in the subject matter, a mutual right to control, [and] a right to share in the profits." *Bassett*, 530 P.2d at 2.

¶ 21 There was, however, a genuine issue of material fact regarding the loss-sharing element. EPCO may have carried its initial burden of providing evidence of an intent to share losses by relying on its interpretation of the Agreement, the actions of the parties, or the prima facie evidence of the profit-

sharing provision, but the inquiry does not end there. Under rule 56(e) of the Utah Rules of Civil Procedure, after a motion for summary judgment has been made and supported, the nonmoving party may prevent summary judgment by "set[ting] forth specific facts showing that there is a genuine issue for trial." Chimento's affidavit, which asserts that Hatch and Broadstone were solely responsible for the losses of the Northshore Project, raised a different, but plausible, interpretation of the Agreement. And as noted by the court of appeals, Chimento's interpretation of the Agreement was not a bald assertion; rather, "when Chimento's affidavit testimony is viewed together with the Agreement's provisions, several of the provisions ... lend credence to his assertions and give rise to reasonable inferences favorable to [51–SPR's] position." *Ellsworth Paulsen Constr. Co.*, 2006 UT App 353, ¶ 15, 144 P.3d 261. "Where, as here, equally plausible contrary inferences may be drawn, neither party should have been granted summary judgment." *Goodnow v. Sullivan*, 2002 UT 21, ¶ 18, 44 P.3d 704 (Wilkins, J., concurring). Thus, because 51–SPR raised a reasonable inference that it had no duty to share in the losses of the Northshore Project, a genuine issue of material fact existed and summary judgment was inappropriate.

¶ 22 Our holding is consistent with the District of Columbia Court of Appeals' holding in *Beckman v. Farmer*, 579 A.2d 618 (D.C.1990). In *Beckman*, Farmer brought a claim for breach of fiduciary duty against two attorneys with whom he practiced law (collectively, "Beckman"). *Id.* at 625–26. In order to assert this claim, Farmer first had to establish that a partnership existed between himself and Beckman; accordingly, Farmer filed a motion for summary judgment on the partnership claim. *Id.* at 626. There was no partnership agreement with a loss-sharing provision; thus, in his motion for summary judgment, Farmer proffered other evidence—such as a lease and promissory notes

agree that such an inference should be drawn—especially on summary judgment. As previously noted, the sharing of losses is an important distinction between an investment relationship and a joint venture. Many investment relationships consist of one party providing the labor and the

other party providing the capital. Holding that such an arrangement implies a duty to share losses blurs the line between investors and joint venturers and could result in situations in which parties intend to enter into an investment relationship but are later held to be joint venturers.

securing bank loans—to show that he had agreed to share in the losses of the firm. *Id.* at 628. In rebuttal, Beckman asserted that he and Farmer had agreed to an employer/employee relationship in which Farmer was not obligated to share in the losses of the firm, and Beckman supported this allegation with specific incidents and events, tax returns, and a profit-sharing agreement. *Id.* at 630–32. The superior court concluded that Beckman did not overcome Farmer's "very substantial evidence"; thus, it held that a partnership existed as a matter of law and granted Farmer's motion for summary judgment. *Id.* at 626.

¶ 23 The District of Columbia Court of Appeals reversed, holding that summary judgment was inappropriate on the partnership claim because Beckman had raised genuine issues of material fact regarding the duty to share losses.[4] *Id.* at 632. The court reasoned that Beckman's rebuttal evidence and the inferences drawn therefrom raised material issues of fact regarding whether the parties intended to share losses, which in turn raised questions of fact regarding the ultimate issue of the existence of a partnership. *Id.* at 629, 632. The court noted that although the inferences drawn from Beckman's evidence "far from overwhelmingly" supported Beckman's contention that Farmer had no duty to share in the losses, the inferences were sufficient to raise a genuine issue of material fact, thereby making the partnership determination inappropriate for summary judgment. *Id.* at 632.

¶ 24 Similarly, in this case, although EPCO's motion for summary judgment contained some evidence of an intent to share losses between 51–SPR and Broadstone, 51–SPR's rebuttal evidence—Chimento's affidavit and the inferences drawn from it—raised genuine issues of material fact regarding the loss-sharing element. Consequently, an issue of material fact remained regarding the ultimate question of whether a joint venture existed, and summary judgment was inappropriate. We therefore uphold the court of

appeals' reversal of the district court's grant of partial summary judgment.

## II. THE COURT OF APPEALS CORRECTLY HELD THAT EPCO'S LIEN WAS NOT ABUSIVE BECAUSE THE LIEN WAS NOT FILED WITH THE REQUISITE CULPABLE MENTAL STATE

¶ 25 In its cross-petition, 51–SPR argues that the court of appeals erred in ruling that EPCO's lien was not abusive under Utah Code section 38–1–25 (2005).

¶ 26 51–SPR disputes the appropriateness of EPCO's inclusion of the $78,000 change order in the lien. The district court found that EPCO was not entitled to collect the $78,000 as part of the lien because it did not relate to the Northshore Project or 51–SPR. The court of appeals upheld the district court's conclusion. *Ellsworth Paulsen Constr. Co. v. 51–SPR–L.L.C.*, 2006 UT App 353, ¶¶ 26–29, 144 P.3d 261. Neither party disputes the court of appeals' holding on this point. Indeed, EPCO concedes that it cannot collect the $78,000 as part of its lien on the Northshore buildings.

¶ 27 Although the district court held that EPCO could not collect the $78,000, it concluded that the inclusion of the $78,000 did not render the lien abusive because EPCO had acted in good faith when it included the $78,000 in the lien amount. The court of appeals upheld the district court's ruling, holding that subsection (1)(b) of the abusive lien statute requires proof of intent to extract more than is due. *Id.* ¶ 31. Based on the district court's finding that EPCO had acted in good faith when it filed the lien, the court of appeals concluded that EPCO did not file the lien with the requisite culpable mental state; thus, the lien was not abusive. *Id.* ¶¶ 32–34. We agree.

¶ 28 Utah's abusive lien statute is found in Utah Code section 38–1–25. Subsection (1) provides:

Any person entitled to record or file a lien . . . is guilty of a class B misdemeanor who

---

4. The court also found that issues of material fact existed regarding the right to control element of

a partnership. *Beckman,* 579 A.2d at 632.

intentionally causes a claim of lien against any property, which contains a greater demand than the sum due to be recorded or filed:

    (a) with the intent to cloud the title;

    (b) to exact from the owner or person liable by means of the excessive claim of lien more than is due; or

    (c) to procure any unjustified advantage or benefit.

*Id.* § 38–1–25(1).[5] Subsection (2) of the statute provides that, in addition to the criminal penalties, a person who files an abusive lien is liable to the owner of the property upon which the lien was filed for the greater of actual damages or "twice the amount by which the wrongful lien exceeds the amount actually due." *Id.* § 38–1–25(2).

¶ 29 51–SPR argues that because subsection (1)(a) specifically mentions intent but subsections (1)(b) and (1)(c) do not, there is no intent requirement under the latter two subsections. Subsection (1)(a) provides that a lien is abusive if a person files the lien *"with the intent* to cloud title," whereas subsections (1)(b) and (1)(c) provide that a lien is abusive if a person files the lien "to exact . . . more than is due" or "to procure any unjustified advantage or benefit." *Id.* § 38–1–25(1) (emphasis added). 51–SPR thus argues that the absence of an intent requirement in subsections (1)(b) and (1)(c) renders them akin to strict liability statutes. Because 51–SPR claims that the lien is abusive under subsection (1)(b), 51–SPR asserts that EPCO's good faith is immaterial and, consequently, that the district court erred in holding that the lien was not abusive.

¶ 29a As noted by the court of appeals, any potential confusion about an intent requirement is cured by referencing Utah Code section 76–2–102 (2003), which provides:

Every offense not involving strict liability shall require a culpable mental state, and when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility. An offense shall involve strict liability if

the statute defining the offense clearly indicates a legislative purpose to impose criminal responsibility for commission of the conduct prohibited by the statute without requiring proof of any culpable mental state.

¶ 30 The abusive lien statute is a criminal statute and does not "clearly indicate[ ] a legislative purpose" to impose strict liability on a lien claimant who fails to collect the entire amount of the originally filed lien. *Id.* Thus, although subsections (1)(b) and (1)(c) do not specify the required mental state necessary to establish criminal responsibility, the default culpable mental states of "intent, knowledge, or recklessness" apply. *Id.*

¶ 31 The district court's holding that EPCO acted in good faith was based on its finding that, when EPCO filed its lien on the Northshore buildings, it did not know exactly how Hatch had used the $78,000 it had loaned to him. All EPCO had was a change order for $78,000 on one of the Northshore buildings; EPCO did not yet know how much, if any, of the $78,000 had actually been used or applied to the construction of the Northshore buildings. The court of appeals concluded that these findings were not clearly erroneous, *Ellsworth Paulsen Const. Co.,* 2006 UT App 353, ¶¶ 33–34, 144 P.3d 261, and we conclude likewise. Based on the district court's findings, we hold that EPCO acted in good faith and did not intentionally, knowingly, or recklessly include the $78,000 in order to exact more than was due; thus, EPCO's lien was not abusive.

¶ 32 In sum, we conclude that the court of appeals correctly interpreted Utah Code section 38–1–25 by incorporating the default mental state from Utah Code section 76–2–102. We further conclude that EPCO did not file the lien with the requisite culpable mental state. Therefore, we affirm the court of appeals' holding that the lien was not abusive.

## CONCLUSION

¶ 33 Because 51–SPR raised a genuine issue of material fact on the question of wheth-

---

5. The wording of the statute was slightly modified in 2007, *see* Utah Code Ann. § 38–1–25

(Supp.2007), but the changes do not affect our analysis.

er 51–SPR and Broadstone agreed to share losses, the court of appeals correctly concluded that it was inappropriate for the district court to find a joint venture on summary judgment. Additionally, the court of appeals correctly interpreted the abusive lien statute by incorporating the default mental state from Utah Code section 76–2–102 (2003). We accordingly affirm.

¶ 34 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.